**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CARL VITALONE, individually and on behalf of all other similarly situated,

PLAINTIFFS,

v.

LOGITECH INTERNATIONAL SA, et al.,

Defendants.
_____/

No. C 11-03855 RS

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS THE
CONSOLIDATED CLASS ACTION
COMPLAINT**

I.  INTRODUCTION

Lead plaintiff Sui Pui Leung brings this putative class action for securities fraud against defendants Logitech International SA ("LOGI"), the company's former CEO, Gerald P. Quindlen, and LOGI's CFO, Erik K. Bardman.  Plaintiffs sue on behalf of himself and all persons who purchased publicly-traded LOGI common stock between October 28, 2010 and September 21, 2011 ("the Class Period"), alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated under Section 10(b) by the Securities Exchange Commission ("SEC").  Defendants move to dismiss the consolidated class action complaint ("CCAC") contending plaintiffs have failed sufficiently to plead an actionable misrepresentation or a strong inference of scienter.  For the following reasons, defendants' motion to dismiss is granted with leave to amend.

**United States District Court**
For the Northern District of California

## II. BACKGROUND[1]

LOGI is a publicly traded company that develops, manufactures and sells peripheral devices for computers, such as keyboards and mice, as well as other entertainment and communication appliances including webcams and speakers. The majority of the company's revenues are derived from the sale of its peripheral products which are distributed through a network of retailers, resellers, and original equipment manufacturers. LOGI reports its revenues for each fiscal year, running from April 1 to March 31, for three geographical regions: the Americas, Asia Pacific, and EMEA ("Europe, Middle East, and Africa"). Prior to the Class Period, EMEA sales traditionally accounted for over 40% of LOGI's peripheral device sales.

According to the CCAC, in the 2009 fiscal year ("FY09") defendant Gerald Quindlen was appointed as LOGI's new CEO. Under pressure to meet financial forecasts made to shareholders, Quindlen began "channel stuffing," characterized as sending excess products to North American retailers, in an effort to demonstrate growth in the current quarter. Although this tactic permitted LOGI falsely to inflate its revenues throughout the beginning of FY09, the overselling eventually caught up with LOGI which reported a $35 million quarterly loss by the end of the fiscal year. Following this financial disaster, plaintiffs assert LOGI made an effort to end channel stuffing in North America, halting excess shipments to its major sellers. These efforts appeared to work: by the end of the fourth quarter of 2010 ("4Q10"), revenues had largely recovered and Quindlen assured investors of the reset of LOGI's "channel partners' inventory." (CCAC ¶ 42).

The company's upturn continued and in 1Q11 LOGI's reported earnings surpassed Wall Street estimates. Quindlen told investors that sales in EMEA were up and, consequently, raised FY11's sales estimate, operating income estimate, and gross margin estimate. As LOGI's 1Q11 inventory increased and revenues continued to rise, however, analysts became increasingly skeptical of LOGI's success, nervous the company was once again engaging in channel stuffing. To quell these fears, Bardman and other LOGI representatives explained that global demand was up and the disparity between the rates of products sold to distributors ("sell-in") and to ultimate consumers ("sell-through") was simply a statistical anomaly, and not indicative of inventory build-up.

---

[1] The facts set forth above are drawn from the CCAC which must be accepted as true for purposes of this motion.

No. C 11-03855 RS
ORDER GRANTING MOTION TO DISMISS

Midway through FY11, LOGI issued its 2Q11 financial results reporting an additional 17% increase in quarterly sales and a 20% increase of sell-through in EMEA. These increases led to further assurances from Quindlen and Bardmen that the financial success was due to supply chain efficiencies and a variety of operational benefits. They suggested that LOGI was targeting a long term gross margin range of 35% to 37%, a 3% increase from LOGI's historical margin range. Investors responded favorably to this news and the LOGI stock price increased over 12% in mid-FY11.

According to plaintiffs, however, this stock price increase would prove ephemeral. Quindlen and Bardmen had misrepresented LOGI's success in explaining that improved revenues were due to operational efficiencies and high European demand, when, in fact, the company had once again begun channel stuffing, this time in EMEA. Specifically, plaintiffs explain that at the end of FY10, LOGI implemented a plan to alter the European channels in an effort to maximize sales of computer mice and keyboards. This tactic, according to confidential informant ("CW") 5, was dubbed the "Mercury" plan which consisted of moving high volume shipments of keyboards and mice to EMEA retailers in an effort to boost margins. CW5 and CW6 attest that in exchange for accepting these shipments, LOGI promised retailers price protection against online vendors selling the same products at lower prices as well as a variety of valuable incentives. Consequently, through this program, LOGI sold its products to retailers at very high prices, who would then sell to customers at lower prices and claim rebates from LOGI. This allowed LOGI to present higher revenues for the first two quarters of FY11, thereby, masking the overstocked inventories in Europe and feigning that demand in EMEA was high.

By the start of 3Q11, however, the tactics of the Mercury plan began to backfire. EMEA sales plummeted, overstocked inventory failed to sell-through, and retailers were forced to return unsold inventory to LOGI. Consequently, as the company's gross margins began to decline, plaintiffs contend, defendants continued to cover up the company's channel stuffing, insisting demand in Europe remained high and any decline was only a result of the launch of LOGI's Revue box for Google TV.

LOGI's losses became increasingly difficult to conceal, however, and CW6, CW1, and CW4 assert that by the start of 4Q11, at least internally, LOGI management began to acknowledge that EMEA business was suffering. Soon after, income in the Americas also decreased. Thus, on the last day of FY11, when it could no longer hide behind lofty projections, LOGI revealed to investors that sales and profits would not meet the previously forecasted levels. Company representatives also warned that profits would be 17% lower than expected. Explaining these dismal results, Bardman and Quindlen expressed disappointment with the unexpected and sudden decline in demand for LOGI products throughout Western Europe. Plaintiffs argue these statements were misrepresentations as LOGI's three main European distributors actually reported an increase in demand at the end of FY11. Accordingly, plaintiffs contend the decrease in profits was a consequence of channel stuffing, not lower demand, as defendants described.

At the start of FY12, LOGI began to unravel the Mercury plan and continued to lose revenue. As a result, Quindlen was fired as CEO and LOGI's stock price plummeted, thereby costing class members hundreds of millions of dollars. Plaintiffs, thereafter, brought this action in the Southern District of New York on behalf of himself and all persons who purchased publicly-traded LOGI common stock during the Class Period, alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated under Section 10(b) by the Securities Exchange Commission ("SEC"). The case was subsequently transferred to this Court where Sui Pui Leung was appointed lead plaintiff and filed the CCAC. Defendants now move to dismiss the action in its entirety.

### III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must present "a short and plain statement of the claim" demonstrating that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2). If this standard is not met, the defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(6), dismissal is appropriate if the claimant either does not raise a cognizable legal theory or otherwise fails to allege sufficient facts to support a cognizable claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Thus, while a legally sufficient complaint does not require "detailed factual allegations," it

must contain more than "unadorned" assertions of harm or bare legal conclusions without factual support. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Furthermore, Federal Rule of Civil Procedure 9(b) requires that "[in] allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy the rule, plaintiffs must plead the "who, what, where, when, and how" of the alleged misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). In claims governed by the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs must meet additional pleading requirements beyond those imposed by the Federal Rules, as elucidated below.

## IV. DISCUSSION

In the first claim for relief, plaintiffs allege that LOGI, Quindlen, and Bardman, violated section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. Section 10(b) makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 further provides: "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). In the second claim, plaintiffs assert defendants violated section 20(a) of the Exchange Act, which makes certain "controlling" individuals also liable for violations of section 10(b) and its underlying regulations. In order to maintain a section 20(a) claim, a plaintiff must sufficiently plead an underlying section 10(b) violation. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)

A claim for violation of Rule 10b-5 includes five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Id.* (quoting *In re Daou Sys., Inc. Secs. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005)) (internal quotation marks omitted). Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 998 (9th Cir. 1999) (explaining that a securities fraud complaint must specify "the who, what, when, where and how: the first paragraph of any newspaper story."); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1185 (C.D. Cal. 2008) ("The PSLRA requires that falsity allegations in securities fraud claims meet an even higher standard than Rule 9(b)'s particularity requirement.").

With respect to scienter, the PSLRA requires that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Under the law of this circuit, to state a claim for a section 10(b) violation, a complaint "must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Daou*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citing *In re Silicon Graphics Secs. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). Defendants move to dismiss plaintiffs' claims for failure to plead an actionable misrepresentation or a strong inference of scienter.

A.    False and Misleading Statements

Plaintiffs allege defendants made a number of false and misleading statements related to LOGI's financial position, the demand for its products in EMEA, and the distributor inventory levels throughout EMEA and the Americas, thereby, deluding investors into believing the company's revenues were improving. These statements constituted misrepresentations and violated the PSLRA because, according to the CCAC, defendants omitted any mention of channel stuffing or of the Mercury plan in an effort to project an image of sales growth for the first two quarters of FY11. In the securities context, a statement is misleading if it is facially false, or omits material facts thereby "affirmatively creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citing *McCormick v. The Fund Am. Cos.*, 26 F.3d 869, 880 (9th Cir. 1994)). Here, plaintiffs identify a number of statements from LOGI's 2Q11 Earnings Report, 3Q11 Investor Presentations, 3Q11 Earnings Report, 4Q11 Earnings Report, and 1Q11 Earnings Report as misrepresentations or otherwise false. With regard to all the statements, however, plaintiffs fail to assert sufficient facts under the high PSLRA pleading standard to demonstrate falsity or the

**United States District Court**
For the Northern District of California

presence of material omissions.  Additionally, a number of the statements on their face constitute mere puffery or are immunized under the Reform Act's Safe Harbor.

### 1.   Falsity

To establish falsity, plaintiffs argue that a number of statements concerning LOGI's strong gross margin performance, FY11's sell-in and sell-through data, the company's improved operational efficiency, and growing EMEA demand were deceitful and promulgated only in an effort to conceal improper channel stuffing practices.   Importantly, plaintiffs do not allege that LOGI misreported any specific financial results, such as revenue or earnings, but rather that the company made false assurances related to consumer demand, inventory levels, and the reasons for LOGI's financial success.  For example, in a conference call on October 28, 2010, Quindlen expressed optimism as to consumer demand for all products in 2Q11, explaining LOGI had received "double-digit sell-through growth in all our retail regions" and noting that the company had attained "record-breaking margin despite negative impact of the weaker euro."  (CCAC ¶ 113).  In the same call, Bardman explained that LOGI's channel partners had "relatively low inventory levels" and that overall the company's "inventory is very healthy."  (CCAC ¶¶ 115-116).  Similar statements were documented in 3Q11 when Bardman assured investors at the Morgan Stanley Technology, Media & Telecom Conference on November 17, 2010, that he felt "well-positioned with the channel" because the company is "at very good levels" and the "metrics are very healthy."  (CCAC ¶ 127).

According to the CCAC, these statements were facially false because under the Mercury plan inventory levels were actually abnormally high and unhealthy.  Furthermore, the financial growth of the first half of FY11 was not a result of "sell-through growth" or "record-breaking margin," but rather of the artificial short term effects of channel stuffing.  Plaintiffs support these averments by referring to defendants' later statements in the second half of FY11 which acknowledge "a weaker than anticipated demand in the second half of Q4" and "poor execution of channel pricing and promotional programs within the region."  (CCAC ¶ 142).  Plaintiffs, thereby, reason that defendants must have known about the overstocked inventory prior to 4Q11, but misrepresented EMEA demand and margin levels in an effort to conceal the ongoing channel stuffing scheme imposed by the Mercury plan.

**United States District Court**
For the Northern District of California

Channel stuffing claims are viewed with skepticism in the Ninth Circuit because there are often genuine reasons to strive for earlier sales. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (referring to channel stuffing claims as "speculation made in hindsight").[2] "[A]llegations of [s]tuffing alone, even if proved" therefore do not entitle plaintiffs to relief. *Belodoff v. Netlist, Inc.*, No. SA CV 07-00677 DOC (MLGx), 2008 WL 2356699, at *12 (C.D. Cal. May 30, 2008) (describing the pleading standards for channel stuffing after *Twombly*). Rather, such claims are only probative of falsity if plaintiffs can (1) demonstrate defendants engaged in channel stuffing *in order to* "artificially inflate sales," *Steckman*, 143 F.3d at 1298, and (2) make a showing of "specific transactions, specific shipments, specific customers, specifics times, or specific dollar amounts." *Ashworth*, 2000 WL 33176041 at *6; *see Mallen v. Alphatec Holdings, Inc.*, 10-CV-1673-BEN MDD, 2012 WL 987314 (S.D. Cal. Mar. 22, 2012) ("[T]o survive a motion to dismiss more than conclusory allegations [of stuffing] are necessary."); *Wietschner v. Monterey Pasta Co.,* 294 F.Supp.2d 1102, 1114 (N.D. Cal. 2003)).

Here, plaintiffs fail to establish improper conduct, present specific transactions, or provide more than conclusory allegations of channel stuffing. The CCAC merely explains the alleged details of the Mercury plan and refers to two distributors in North America and one in Europe that were afforded discount incentives and complained of overstock. (*E.g.*, CCAC ¶¶ 69 & 77). Plaintiffs, thus, do not supply the transaction-specific detail necessary to establish a channel stuffing claim,[3] *Ashworth*, 2000 WL 33176041 at *6; *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d at 1061 (dismissing channel stuffing claim when plaintiffs only listed two distributors and failed "to provide any corroborating details" of specific transactions), relying instead on vague assertions of overstocking and a thinly supported allegation of LOGI's FY09 channel stuffing scheme. This

---

[2] *See also In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1061 (C.D. Cal. 2004); *In re Splash Tech. Holdings Inc., Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001) ("The allegation of 'channel stuffing', therefore, remains 'conclusory, and the inference of false statements unavailing.'"); *In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041, at *7 (S.D. Cal. 2000) ("[T]his Circuit has rejected 'channel stuffing' claims.").

[3] Plaintiffs appear to acknowledge the absence of particularized channel stuffing allegations in the CCAC, attempting to distinguish the cases above by contending that they involved false financial reports, as opposed to this case based in allegations of lowered sales caused by overstocked inventory. To accept such an argument would be to reward plaintiffs for the overall vagueness of their averments.

showing is insufficient to plead that defendants engaged in channel stuffing with the intent of artificially inflating sales, let alone to demonstrate that channel stuffing actually occurred.

Furthermore, plaintiffs' argument that defendants admitted to channel stuffing throughout FY11 when they expressed disappointment about the high levels of inventory at the close of FY11 is to no avail. To demonstrate falsity, the CCAC must present facts showing statements were false when made, not that defendants learned of the falsity months later. *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) ("To meet this pleading requirement, the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made," (quoting *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001))); *see N.Y. State Teachers' Retirement Sys. v. Fremont Gen. Corp.*, No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) (finding that plaintiff identifies no objective means for determining defendant's "valuation of its residual interests was *fraudulently* inflated at the time" of the alleged misrepresentations) (emphasis in original). Consequently, plaintiffs cannot rely on defendants' alleged admissions of overstocked channels at the end of FY11 in order to establish the existence of unhealthy inventory months earlier. At present, therefore, it is merely speculative that the decline in revenue in FY11 was the result of channel stuffing. *See generally Belodoff*, 2008 WL 2356699, at *13.

2. Puffery

Moreover, plaintiffs' allegations that defendants falsely represented the level of demand in EMEA, specifically in Germany, are not supported by the facts presented. Not only does the CCAC fail to support the averment that demand was in fact dropping in EMEA at the start of FY11, but many of the identified statements appear to be no more than puffery. Projections of optimism are only actionable as misrepresentations under 10(b) if "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) (citing *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993), *cert. denied*, 513 U.S. 917 (1994)); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989), *cert. denied*, 496 U.S. 943 (1990). In other words, statements which are "generalized, vague and unspecific" and

United States District Court
For the Northern District of California

constitute "mere 'puffery' upon which a reasonable consumer could not rely" cannot support PSLRA's heightened pleading requirement. *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003). Both professional and amateur investors are expected to know how to weigh optimism expressed by company executives who carry a stake in their business' success. *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).

Plaintiffs contend that defendants' repeated positive statements about European consumer demand transcend puffery and represent calculated misrepresentations intended to conceal the true reason for LOGI's increased revenues. For example, during 2Q11, in both a webcast and a conference call, defendants told investors that consumer demand remained "strong" and inventory levels were "healthy." (CCAC ¶¶ 105, 113 & 117-18). Bardman further commented that "if that additional higher demand we're preparing for could happen—does not materialize, we feel well-positioned that, because of the freshness of our inventory, we would handle that as we go into the end of Q3 and into Q4." (CCAC ¶ 117). Similar assurances continued in 3Q11 when Bardman expressed that the company "feel[s] well-positioned with the channel" and believes the "metrics are healthy." (CCAC ¶ 127).

Courts in this Circuit, however, have routinely attached to similar statements the label of puffery. *See, e.g.*, *Petrie v. Elec. Game Card Inc.*, SACV 10-00252 DOC, 2011 WL 165402 (C.D. Cal. Jan. 12, 2011); *In re Impac Mortgage Holdings, Inc. Sec. Litig.,* 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008); *In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 335 F. Supp. 2d 1069, 1087-88 (N.D. Cal. 2005). Specifically, words such as "strong" and "healthy," which plaintiffs argue constitute misrepresentations, have been found to be "far too vague to be actionable under the PSLRA." *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) (explaining that statements containing the words "strong" and "healthy" were mere puffery); *In re Splash Tech. Holdings Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1077 (N.D. Cal. 2001) (finding the words "strong," "robust," "well positioned," "solid," and "improved" to be non-actionable). Accordingly, plaintiffs have presented insufficient facts to support the claim that defendants' statements related to strong consumer demand and healthy channel levels constituted more than corporate optimism.

United States District Court<br>For the Northern District of California

United States District Court
For the Northern District of California

### 3. Safe Harbor Act

Beyond categorization as puffery, many of the statements attributed to defendants in the CCAC fall within the PSLRA safe harbor provision which precludes liability for forward looking statements that are (1) "identified as forward-looking statements, and [] accompanied by meaningful cautionary" language; (2) immaterial; or (3) made without "actual knowledge" of falsity.  15 U.S.C. § 78u–5; *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir. 2010) ("The PSLRA also provides an additional barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'").  "A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Splash*, 160 F. Supp. 2d at 1067-68; *see Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir. 2004) (determining whether statements are forward looking at the motion to dismiss stage).

Plaintiffs allege defendants' representations addressing LOGI's future growth are not entitled to safe harbor protection because, although they concern financial guidance for the upcoming quarters, the statements were intended to provide inventors with an indicator of the company's *present* financial position.  For example, plaintiffs contend that in explaining at the 2010 Analyst and Investor Day that LOGI was "poised to deliver annual gross margins of 35% to 37%" in the upcoming quarters, defendants misrepresented LOGI's current financial state.  These alleged misrepresentations continued in LOGI's 2Q11 Earnings Report when Quindlen reported that "[a]s a result of our very strong gross margin performance in the first half of FY2011, we have raised our operating income outlook for the full fiscal year."  As explained above, plaintiffs have failed sufficiently to allege that LOGI's financial situation in the first half of FY11 was in fact dire or that Quindlen was lying when he expressed confidence with the "very strong gross margin."[4]  Consequently, there is no basis for plaintiffs to rebut the presumption that the statements were made without actual knowledge of falsity.  15 U.S.C. § 78u–5.  Furthermore, Quindlen's optimistic response in raising operating income and discussing revenues for the upcoming years falls squarely

---

[4] Notably, even if LOGI was experiencing an economic downturn, Quindlen's use of the word "strong" to describe healthy margins is mere puffery.  *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003).

within the protection of the safe harbor provision. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 947 (N.D. Cal. 2010) (determining that statements expressing a "substantially high probability" of improving future revenue were protected by the safe harbor provision); *see also Harris v. IVAX Corp.*, 182 F.3d 799, 805 (11th Cir. 1999). Accordingly, defendants' statements regarding the improved revenue and increased gross margins in FY11 are immunized from liability and cannot support plaintiffs' securities law claims.

### B.  Scienter

Just as there is a deficiency in the identification of specific false statements, there is also an insufficient demonstration of scienter. As stated above, to state a claim for violation of Rule 10b-5, plaintiffs must plead scienter and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008) (quoting *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir. 2001)). Since plaintiffs failed adequately to plead that any of the identified statements were in fact false or misleading, a finding of scienter is necessarily precluded.

### C.  Section 20(a)

Section 20(a) claims may be dismissed summarily if plaintiffs fail adequately to plead a primary violation of section 10(b). *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993). Plaintiffs' second claim, therefore, must also be dismissed with leave to amend.

### V.  CONCLUSION

Plaintiffs fail to present the elements of falsity and scienter that are necessary to state a claim pursuant to section 10(b), Rule 10b-5, or section 20(a). Accordingly, the CCAC must be dismissed with leave to amend. If plaintiffs elect to amend the CCAC, they must do so within thirty days of the date of the issuance of this order, or the action may be subject to dismissal with prejudice.

IT IS SO ORDERED.

Dated:   7/13/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California